# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF GEORGIA
# BRUNSWICK DIVISION

UNITED STATES OF AMERICA,

v.

CASE NO.: CR209-49

BENNIE SAMS, JR.
ERICA L. JACKSON
JOY L. WASHINGTON

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendants Bennie Sams, Jr., Erica Jackson, and Joy Washington have been charged with conspiracy to possess with intent to distribute and to distribute a controlled substance, in violation of 21 U.S.C. § 846; possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1); and aiding and abetting, in violation of 18 U.S.C. § 2. Defendant Sams also has been charged with possession of a firearm by a person convicted of domestic violence, in violation of 18 U.S.C. § 922(g)(9). Defendant Jackson filed a Motion to Suppress[1], to which the Government responded. The undersigned conducted an evidentiary hearing on April 5, 2010, at which Investigator Eric Melendez, Hank Scott, and Timothy Williams testified. Jackson filed a post-hearing Brief, to which the Government responded. For the reasons which

---

[1] Defendant Sams filed a Preliminary Motion to Suppress, which is very general. Defendants Sams and Washington filed Motions to Adopt the motions filed by co-Defendants. The undersigned has structured this Report to reflect his recommended disposition of Defendant Jackson's Motion to Suppress, as well as Defendant Sams' and Defendant Washington's Motions by adoption. Defendant Washington has filed separate Motions to Suppress, which are addressed in a Report and Recommendation of even date.

follow, Defendant Sams' and Defendant Jackson's Motions should be **GRANTED** in part and **DENIED** in part.

## FINDINGS OF FACT

The credible testimony given at the evidentiary hearing establishes the following:

The Glynn-Brunswick Narcotics Enforcement Team ("GBNET") began receiving information regarding Defendant Sams in 2008. Investigator Eric Melendez ("Melendez") became involved in this investigation during 2009, and a confidential information ("CI") had been providing Melendez with information on Sams. Melendez stated that, to his knowledge, Sams was living at 327 Nottingham Drive in Brunswick, Georgia, in April 2009. The CI informed Melendez around the first of April 2009 that a shipment of narcotics was to be delivered to that address around April 17, 2009. The CI also informed Melendez that either a black male named Jeff or his wife, a black female named Joy, would be driving a rental car from Florida to Brunswick, and the driver of this car would be in possession of 200 to 300 pieces of crack cocaine. Based on this information, Melendez and Sergeant Elliot ("Elliot") started surveilling the house the week Melendez received this information. The CI told Melendez that the narcotics shipment was due to arrive at 327 Nottingham Drive around 3:00 p.m. on April 17th. Melendez testified that he and Elliot began surveillance of the residence about 1:00 p.m., were parked about 150 to 200 feet away from the residence, and could see the front of the house. Melendez also testified that he saw Defendant Sams drive up to the residence around 2:15 p.m. Around 3:00 p.m., Melendez saw a black female, who was later determined to be co-Defendant Joy Washington, drive up to this address in a white car. Melendez stated that Defendant Washington got out of the car, walked to the trunk,

2

AO 72A
(Rev. 8/82)

grabbed a bag out of the trunk, and walked toward the front door of the house. Melendez also stated that a few minutes later, Defendant Washington walked back from the house to the car and got back into the car. Defendant Washington backed out of the driveway, and Melendez and Elliot began following the car. Melendez spoke with the shift supervisor, Sergeant Lodise, about having an officer driving a marked patrol car stop Defendant Washington's car. Melendez testified that Sergeant Lodise was able to follow Defendant Washington's car into the local Wal-mart parking lot, where she parked for a minute or so and then returned to 327 Nottingham Drive. Once Defendant Washington was back at the house, Melendez testified that she again got out of the car, went to the trunk, removed a bag, and walked toward the front door of the house. Melendez testified that Defendant Washington was again in the residence for a few minutes, got back into the car, and drove away. Melendez stated that, based on his training, knowledge, and experience, he believed a drug transaction had occurred, and he informed other officers to pick up the surveillance of Defendant Washington's vehicle. Melendez specifically stated that Officer Hank Scott ("Scott"), who was a canine officer with Glynn County at the time, was instructed to initiate a traffic stop once Defendant Washington's vehicle turned southbound onto Interstate 95. Melendez declared that, after Defendant Washington left the house, he saw two (2) other cars arrive at 327 Nottingham Drive. Melendez stated that the drivers of both of these cars got out of their cars, walked toward the front door of the house, came back from the front door area a minute or so later, got back into their cars, and left. Melendez also stated that he thought a shipment of illegal narcotics was at this house and that other dealers from the area came to get their supplies of drugs from 327 Nottingham Drive.

3

Melendez went to his office and prepared an affidavit for a search warrant for 327 Nottingham Drive. Melendez requested a "no-knock" provision in his affidavit based on information that Defendant Sams kept an AK-47 at this house. A county magistrate issued the search warrant around 5:30 p.m. on April 17, 2009. Melendez testified that approximately 200 pieces of crack cocaine and an AK-47 were found during the execution of the search warrant. Melendez stated that he identified 327 Nottingham Drive as being Defendant Sams' house based on information the CI provided and based on Sams' car being parked in front of this house on previous occasions. Melendez also stated that a Babcock Furniture bill with Defendant Sams' name was found inside this house.

Sams and Jackson assert that the search warrant was not supported by probable cause, and the search was not conducted with their consent. Jackson also asserts that she was arrested without probable cause. Finally, Jackson asserts that police officers violated her rights by continuing to question her after she invoked her right to remain silent.

## DISCUSSION AND CITATION TO AUTHORITY

### I. The Search Warrant/Probable Cause

"[T]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. "Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability

of finding contraband or evidence at a particular location." United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999). "Probable cause is a fluid concept-- turning on the assessment of probabilities in particular factual contexts" and is based on the "totality of the circumstances test." Id. (internal citations and punctuation omitted). "[J]udicial determination of probable cause to issue a search warrant[ ]" is "accord[ed] great deference." United States v. Robinson, 62 F.3d 1325, 1331 (11th Cir. 1995).

In the Application and Affidavit for Search Warrant, Melendez detailed the information provided by the CI, such as information regarding previous shipments of cocaine to 327 Nottingham Drive from Miami, Florida. Melendez stated that the CI specifically told him these previous shipments had been delivered in rental cars from Florida; the driver of the vehicles was either Jeff or his wife, Joy; the driver of the vehicle stayed at the house for a short time and then left; and "BJ" (who the Court presumes is Defendant Sams) would pay $15,000 to $30,000 to the person delivering the cocaine. Melendez also detailed the events which occurred on April 17, 2009[2], such as Joy Washington arriving at 327 Nottingham Drive in a white rental car from Florida, and Defendant Washington coming to this house on two (2) occasions and leaving after a brief time and getting a bag out of the trunk of the car both times. Melendez declared that the information the CI provided him was corroborated during the traffic stop[3], which led him to believe that there was cocaine, as well as evidence relating to the sale of

---

[2] The date is listed as "04-19-09" in Melendez's Application. The undersigned interprets this as a scrivener's error, as the warrant was signed on April 17, 2009, and the evidence from the hearing outlines events which occurred on April 17, 2009.

[3] Facts pertaining to the traffic stop are discussed in more detail in a Report and Recommendation of even date.

cocaine and at least one (1) firearm, located in 327 Nottingham Drive. (Gov't's Ex. 1, pp. 6-7).

Based on the totality of the circumstances, there was "a fair probability" that evidence of the sale and purchase of cocaine and a firearm would be found at 327 Nottingham Drive. Brundidge, 170 F.3d at 1352. The issuance of the search warrant was supported by probable cause. Because there was a valid warrant for the search of 327 Nottingham Drive, the police need not have gotten consent to search the house.

Moreover, Defendant Jackson's arrest was supported by probable cause. Although probable cause involves a greater certainty of criminal behavior than reasonable suspicion, probable cause does not require the same "standard of conclusiveness and probability as the facts necessary to support a conviction." United States v. Dunn, 345 F.3d 1285, 1290 (11th Cir.2003). Probable cause to arrest exists when the totality of the facts and circumstances support "a reasonable belief that the suspect had committed or was committing a crime." United States v. Lindsey, 482 F.3d at 1291. It was reasonable for police officers to believe at the time of Jackson's arrest that she had committed a crime.

These portions of the Motions should be denied.

II. **Admissibility of Jackson's Statements**

Jackson also moves to suppress any statements she may have provided to police officers. Jackson asserts that she told the interrogating officer twice that she had nothing to say. Jackson alleges that the officer "attempted to overcome her resistance by telling her he just wanted to get her 'side of the story.'" (Doc. No. 139, p. 4).

AO 72A
(Rev. 8/82)

No person . . . shall be compelled in any criminal case to be a witness against [herself][.]" U.S. CONST. amend. V. "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 444 (1966). "Prior to any questioning, the person must be warned that [s]he has a right to remain silent, that any statement [s]he does make may be used as evidence against [her], and that [s]he has a right to the presence of an attorney, either retained or appointed." Id. Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [her] freedom of action in any significant way." Id. A person can invoke her right to remain silent by making "simple, unambiguous statements" like she "wanted to remain silent or that [s]he did not want to talk to the police." Berghuis v. Thompkins, ___ U.S. ___, No. 08-1470, 2010 WL 2160784, at *9 (June 1, 2010) (citing Michigan v. Mosley, 423 U.S. 96, 103 (1975)).

The evidence before the Court reveals that Lieutenant Johnson ("Johnson") with GBNET and another officer entered an interview room in the Glynn County Police Department on June 1, 2009.[4] Johnson told Jackson that they were there to talk to her about the search warrant involving Defendant Sams' residence about a month prior. Johnson began by getting biographical information from Jackson, including the spelling of her name, her date of birth, address, and her level of education. Johnson read Jackson her rights from a form and asked if she understood her rights. Johnson told Jackson that, if she wanted to talk to the police, she needed to sign the form; he turned the form around so Jackson could read it. Johnson asked Jackson if she wanted to talk

---

[4] The Court has reviewed the recording of this interview.

AO 72A
(Rev. 8/82)

about the search warrant and if she wanted to talk about anything at all. Jackson replied, "No." Johnson then asked Jackson if she had anything to say about anything and whether she understood that this was her chance to tell her side of the story. In response, Jackson said there was not a story, only that she had some guns in the house and those guns were hers. Johnson responded that he could not talk to Jackson about the situation, and she ackcnowledged that he could not. Johnson then asked Jackson if she wanted to talk. Jackson indicated that she did not, and Johnson thanked her as he and the other officer left the interview room. (Gov't's Ex. 3).

Though the interview was very brief in duration, this interview lasted longer than it should have. Johnson asked Jackson if she wanted to talk about the search warrant or anything at all, and Jackson said, "No." Jackson's response was unequivocal, and the interrogation should have ceased immediately. The statements Jackson made after her initial response were in response to Johnson asking Jackson if she wanted to talk and whether she understood this was her chance to tell her side of the story. Jackson's June 1, 2009, statements regarding her possession of firearms located at 327 Nottingham Drive were obtained in contravention of her Miranda rights. This portion of Jackson's Motion should be granted.

## CONCLUSION

Based on the foregoing, it is my **RECOMMENDATION** that the portion of Defendant Jackson's motion seeking the suppression of her statements to police officers on June 1, 2009, be **GRANTED**. The Government should not be entitled to use these statements during the trial of this case. It is also my **RECOMMENDATION** that

AO 72A
(Rev. 8/82)

the remainder of the Motion to Suppress be **DENIED**. The Government should be allowed to introduce evidence relating to the search of 327 Nottingham Drive.

**SO REPORTED** and **RECOMMENDED**, this 29th day of June, 2010.

JAMES E. GRAHAM
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev. 8/82)